UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. S1-4:09CR0605RWS (AGF) |
| GREGORY STACY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motions filed by Defendant, Gregory

Stacy. Pretrial matters were referred to the undersigned United States Magistrate Judge

under 28 U.S.C. § 636(b). Defendant filed motions to produce and allow inspection of

grand jury transcripts (Doc. #61); to compel production of rough notes (Doc. #62); for a

bill of particulars (Doc. #63); to suppress statements (Doc. #64); to sever counts of the

superseding indictment (Doc. #65); and to dismiss indictment/counts of the superseding

indictment or in the alternative to preclude the government from arguing that 21 U.S.C.

§841(B)(1)(C) uses a strict liability analysis and a request for jury instruction

incorporating *mens rea* as an element (Doc. #66).[1]

Defendant is charged in a three-count indictment with one count of distribution of

---

[1] Defendant also filed certain other trial motions prior to the filing of the
superseding indictment, which motions have not been referred to the undersigned United
States Magistrate Judge, and remain for determination by the District Court in connection
with the trial.

a controlled substance resulting in death, in violation of 21 U.S.C. § 841(a)(1) and punishable under 841(b)(1)(C), related to the death of Brian Firestine on or about February 23, 2009; one count of conspiracy to possess with intent to distribute and knowingly distribute oxycodone, in violation of 21 U.S.C. § 846; and one count of distribution of oxycodone, in violation of 21 U.S.C. § 841(a)(1). An evidentiary hearing was held on March 16, 2010. The United States was represented by Assistant United States Attorney Michael Bert. Defendant was present and represented by his attorney, Assistant Federal Public Defender Diane Dragan. At the hearing, the United States presented the testimony of Sergeant ("Sgt.") Leonard Pabin, and Deputy ("Dep.") Rich Piatt, both of whom were employed with the Dent County Sheriff's Department. The witnesses were cross-examined extensively by defense counsel. The parties were permitted to file post-hearing memoranda, after which the matter was taken under consideration.[2] Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the

---

[2] Defendant was permitted time to obtain a transcript of the hearing prior to filing his post-hearing memorandum. The government was then granted leave to file a post-hearing memorandum. Thereafter, Defendant filed a reply, without first seeking leave of court. Nonetheless, the undersigned granted leave of court to permit the filing of the reply brief. The Court believes the Speedy Trial Act is tolled from the filing of Defendant's motions through the filing of Defendant's post-hearing reply brief and subsequent prompt disposition, under 18 U.S.C. § 3161(h)(1)(D) and (H). Nevertheless, the Court also finds, pursuant to 18 U.S.C. § 3161(h)(7), that the transcript of the hearing and the post-hearing memoranda were reasonably necessary to address the issues raised by Defendant's motions, and that the ends of justice served by permitting such briefing outweigh the interest of the Defendant and the public in a speedy trial, such that such time shall be excluded from the running of the Speedy Trial Act.

undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

During the early morning hours of February 23, 2009, Sgt. Pabin was dispatched to a trailer at Box 1895 on Highway 119, on reports that a person there had trouble breathing. Sgt. Pabin has been employed with the Dent County Sheriff's Department, off and on, since 2001, has been a Sergeant for five years, and previously was employed as a military policeman for 22 years. At the time, Sgt. Pabin was serving as night shift supervisor at the Dent County Sheriff's Department. When he arrived at the residence, approximately 15-20 minutes after the call, an ambulance was already present. Upon entering the trailer he observed the victim, Brian Firestine, lying on his back on the floor, with his shirt up, and one leg up on the couch. Emergency personnel were attending to him and looking for a pulse and heartbeat. Three other individuals were in the kitchen: Defendant Gregory Stacy, Karen Trawick, and Darrin Firestine, Brian's twin brother.[3]

Sgt. Pabin entered the kitchen and spoke to the three individuals as a group to try to determine what had occurred. He asked whether there had been some heavy drinking, drugs or methamphetamine use. They responded that they had done a little drinking, which they said started the night before, on the 22nd, but denied the use of any narcotics. They told Sgt. Pabin that Defendant had woken up with pains, and had gone to get his medication, and discovered that Brian was not breathing. Trawick called for assistance.

---

[3] Because the victim, Brian Firestine, and his brother, Darrin, have the same last name, the Court shall use their first names.

During this discussion, Darrin was very distraught; he was sweating, his eyes were glassy, and he did not really respond to the officer's questions. Sgt. Pabin was advised that Darrin had performed CPR on Brian for approximately one-half hour. Sgt. Pabin did not recall Defendant saying anything in particular at the scene. The coroner arrived at the scene, and pronounced Brian's death at 5:58 a.m.

Defendant, Trawick and Darrin left the scene, and went to Defendant's residence, where he lived with his parents. Before they left, Sgt. Pabin did not search the Defendant or the other two individuals, and no one was placed under arrest. Sgt. Pabin stayed to examine the trailer. He did not find any evidence of narcotics or other suspicious items. Sgt. Pabin then left the scene to speak to the victim's wife.

After speaking with the victim's wife, Sgt. Pabin went to Defendant's residence, alone, to speak to the three individuals again. Defendant's parents invited Sgt. Pabin into the house and he advised Defendant and the other two who had been at the scene that he wanted to talk to them further. He thereafter interviewed them briefly as a group in either the den or the living room. They all appeared to be concerned and distraught. They again denied that there had been any drugs or heavy drinking the previous night. Sgt. Pabin asked Defendant and Trawick for a written statement. He did not request a statement from Darrin, as he was too distraught. Defendant provided a signed written statement in his own handwriting. Gov't. Ex. 1. In his statement, Defendant stated that Brian had been breathing the previous night but had been too sick to drive him home in the morning. Later he could not wake Brian, and Trawick called 911 while Defendant

4

called his dad.

After obtaining the statements, Sgt. Pabin returned to the Sheriff's office and put the information he learned directly into his written report. He had taken down general information, such as their names, addresses and telephone numbers, on a pad, but he discarded his notes when he entered the information into the computer.

On April 24, 2009, Sgt. Pabin received a fax from the Boone County Medical Examiner (the "ME") outlining the ME's conclusion that Brian died from a methadone overdose. As a result of this information, Sgt. Pabin decided to re-interview everyone who had been at the scene.

At approximately 9:00 a.m., on May 4, 2009, Sgt. Pabin and the Sheriff spoke with Darrin and Trawick, who were staying with Darrin and Brian's mother. Sgt. Pabin advised them of the information he had received from the ME, and said he needed the truth from them. They advised him that Defendant had brought the methadone to the trailer, wrapped in cellophane, and had passed it out. Karen stated that she took two pills orally, and Darrin stated that he shot up five. They believed Brian had injected some as well, but did not know how much he used. Darrin said Defendant had also taken some medication, but didn't know how he had taken it, and Karen said she believed Defendant had injected it. Both stated that Defendant was the one who supplied the methadone. They also advised Sgt. Pabin that Defendant had given them pills in the past, but Sgt. Pabin did not obtain any information at that time regarding the location where that conduct occurred or the quantities involved. When he asked why they had not given him

this information before, Trawick stated that she was worried that she would get in trouble and lose her kids. She also stated that after the incident Defendant contacted her and said that they needed to get their stories straight, and that the pills did not come from him.

After this discussion, Sgt. Pabin wanted to speak with Defendant, and made several attempts to do so. On May 5 he called Defendant's residence, and told or left word with Defendant's mother that he needed to speak to Defendant about the case. His mother called back and left a message with another officer that Defendant was in the hospital, perhaps indicating that he had some problems with his heart. Sgt. Pabin thereafter went by the house several times. One time Defendant was not home; another time he was told that Defendant had to go to a doctor's appointment; and several times no one appeared to be home. At some point he advised Defendant's mother that he needed to speak to Defendant to get the truth, and that he would not spend any time in the County jail.

On June 29, 2009, Sgt. Pabin made contact with Defendant. He drove out to Defendant's house at approximately 8:30 or 9:00 a.m., and saw both Darrin and Defendant's brother, Allen. Darrin stated that he was there to help Defendant's brother cut the grass. At the time, Sgt. Pabin had not known that Darrin was related to Defendant, though he had been aware that Brian and Darrin had been raised in Defendant's home for some period of time. Sgt. Pabin asked Allen to get Defendant and tell him that he needed to see him, and he did so. Defendant came out of the house wearing shorts and a t-shirt, and Sgt. Pabin said he needed to speak with him. Defendant

asked if he wanted to speak there, and he responded, "No, we need to do it at the Sheriff's Department."

Defendant went inside to change his clothes, and returned with a portable oxygen tank that he used. Defendant appeared a little "white," to Sgt. Pabin, but Defendant did not suggest that he was not feeling well, and did not request to have the discussion another time. Had he suggested he was not feeling well, Sgt. Pabin would have conducted the interview another time. Defendant was not advised that he was under arrest, was not placed in handcuffs, and Sgt. Pabin had no plans to arrest Defendant at that time. Defendant agreed to accompany him to the Sheriff's Department. They drove in Sgt. Pabin's patrol car, with Defendant seated in the front seat. During the drive, which took at least ten minutes, Sgt. Pabin recalled that they discussed Defendant's mother's home, but he did not recall talking about the case.

At the Sheriff's Department, Sgt. Pabin took Defendant to a small interview room. The room used to be a kitchen, and was approximately 10' x 12', with one door, a sink, cabinets, a counter top with some chairs, and a two-way mirror above the counter. He asked Deputy Rich Piatt to join them. Dep. Piatt had grown up in the area, and has been employed with the Dent County Sheriff's Department for more than six years. All three sat in the room, with the officers closest to the door. The officers were wearing their sidearms, but they remained holstered at all times, and Defendant was not handcuffed or restrained in any fashion. Although the room was equipped with video equipment, Sgt. Pabin did not attempt to use it because he did not know how. Deputy Piatt did not turn it

on because he considered it to be Sgt. Pabin's interview, and because he knew that the microphone was not working properly.

Sgt. Pabin presented Defendant with a written waiver of rights form, and he read Defendant each of his <u>Miranda</u> rights and had him follow along. Defendant acknowledged that he understood his rights, initialed each right, and thereafter signed the waiver portion of the form and agreed to make a statement. The form was signed at 9:40 a.m. Gov't. Ex. 2. The "WAIVER OF RIGHTS" portion of the form above Defendant's signature reads:

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

<u>Id.</u> No promises or threats were made to induce Defendant to waive his rights or to make his statement. Defendant did not ask any questions about the waiver form and appeared to understand what was said to him. He did not appear to be under the influence of any drugs or alcohol, and his answers were responsive. Dep. Piatt had seen Defendant previously, and to Dep. Piatt Defendant appeared to be his "normal self," and did not exhibit any health problems. Sgt. Pabin advised Defendant that he needed to resolve the matter for Brian's mom. He also told Defendant that if he was truthful, he would not spend any time in "our jail." Sgt. Pabin made that statement to try and set Defendant at ease, and also testified that the statement was true.

He asked Defendant what had happened that night, and at first Defendant provided

the same story he had given earlier.  Sgt. Pabin then advised Defendant that he had taken statements from the other two individuals, had the coroner's report, and knew what had happened.  He also showed Defendant a photograph of Brian on the autopsy table, in which he believed, but was not certain, Brian was clothed.  After showing him the photograph, Sgt. Pabin said, "That's why we're here."  He told Defendant what Trawick and Darrin had told him.  Defendant then changed his story, stating that he had come to the trailer with Brian in Brian's truck, that Defendant had his methadone pills in the truck's glove box, and that he believed Brian might have brought the pills into the trailer.  Later, he admitted he was aware that they all took some of the methadone, but was adamant throughout the interview that he had not distributed or passed out the pills.  The interview lasted approximately 20-30 minutes.

Toward the end of the interview, Sgt. Pabin left the room for a few minutes to get a cup of coffee.  He also wanted to leave Defendant alone with Dep. Piatt, as he knew he had grown up in the area and thought Defendant might feel more comfortable speaking to him.  While Sgt. Pabin was gone, Dep. Piatt told Defendant that he knew him for a long time, and reminded him that everyone knew that he (Dep. Piatt) had worked drugs and narcotics "around here."  He commented on the fact that Defendant kept saying he hadn't "physically" given anything to anyone.  Dep. Piatt stated that to him, that meant Defendant had brought the pills with the understanding that others could have them.  He asked Defendant whether they had had a "pill party," and Defendant said no.  Dep. Piatt then said, so you brought them, with the understanding everyone could have them?

Defendant nodded his head, "yes," and then said that was right.

When Sgt. Pabin returned to the room, they were still discussing the case. He asked Defendant to tell him one more time if what he had told them was the truth, and Defendant said yes. He then advised Defendant that he needed to get his statement in writing. Sgt. Pabin could not remember exactly what he told Defendant, but asked him to put down what Defendant had told them. It is possible that he told Defendant to make sure to put down that he brought the pills. Defendant thereafter completed a written statement, marked as Gov't. Ex. 3. Sgt. Pabin filled in the case number, but Defendant filled in the date, time, name, and the text of the statement itself. What appears on the written statement was a condensed version of what Defendant had stated orally.

After he completed his written statement, Defendant left. Sgt. Pabin could not recall whether he drove Defendant home, or whether Defendant arranged for his own ride. Defendant was not fingerprinted or booked.

<u>The Indictment</u>

Defendant was initially charged on September 17, 2009, with one count of knowingly and intentionally distributing methadone, a Schedule II controlled substance, with death resulting from such distribution, in violation of 21 U.S.C. § 841(a)(1) and punishable under 841(b)(1)(C), related to the death of Brian Firestine on or about February 23, 2009. On January 28, 2010, a superseding indictment was filed adding a charge in Count II of conspiracy to possess with intent to distribute and to knowingly distribute oxycodone, in violation of 21 U.S.C. § 846, during the time period beginning

on a date unknown to the grand jury, but continuing through on or about December 31, 2008; and a charge in Count III of distribution of oxycodone, in violation of 21 U.S.C. § 841(a)(1), during the period on or between December 3, 2008 and January 7, 2009.

## CONCLUSIONS OF LAW

A. **Defendant's Motion to Dismiss the Superceding Indictment or in the Alternative to Preclude the Government from Arguing that 21 U.S.C. § 841(b)(1)(C) Uses a Strict Liability Analysis** [Doc. #66]

Title 21 §841(a)(1) makes it unlawful for any person to "knowingly or intentionally . . . distribute, or dispense, a controlled substance." Section 841(b) sets forth the penalties to be imposed for such unlawful conduct, with the sentence to be determined in accordance with specific factors of the offense as enumerated in §841(b)(1)-(7). Under §841(b)(1)(C), a person who distributes a schedule II controlled substance in violation of § 841(a)(1) "shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life . . . ."

Defendant argues that the enhanced penalty of 20 years to life "if death . . . results from the use" is unconstitutionally vague as applied to him because the "if death . . . results" element contains no *mens rea* requirement. Rather, the provision imposes strict liability if death results from the use of the drug distributed by Defendant. Defendant also argues that the "if death . . . results" provision of §841(b)(1)(C) is unconstitutional if interpreted in a way that would not require the government to prove that the distribution

11

was the "proximate cause" of the death such that the death was "reasonably foreseeable." Although Defendant intertwines these two arguments, the Court will deal with them separately.

Defendant acknowledges that courts faced with the *mens rea* challenge to the constitutionality of the statute have rejected the argument. But Defendant maintains that these decisions are not dispositive because they were decided before United States v. Booker, 543 U.S. 220 (2005), in which the Supreme Court declared the federal Sentencing Guidelines unconstitutional and reaffirmed the holding in Apprendi v. New Jersey, 530 U.S. 466 (2000), that any fact other than a prior conviction that increases the mandatory maximum sentence must be proved to a jury beyond a reasonable doubt.

Defendant's *mens rea* argument has indeed been rejected by the courts, including the Eighth Circuit and a court in this district. See, e.g., United States v. McIntosh, 236 F.3d 968, 972 (8th Cir. 2001); United States v. Houston, 406 F.3d 1121, 1123-24 (9th Cir. 2005); United States v. Soler, 275 F.3d 146, 152 (1st Cir. 2002); United States v. Baker, No. 4:05-CR-496 CEJ, 2007 WL 148796, at *1 (E.D. Mo. Jan. 16 2007). As these cases explain, the plain language of §841(b)(1)(C) distinguishes between the specific intent necessary for the unlawful act of distribution, §841(a)(1), and the strict liability punishment based on whether death or serious injury resulted from the drug's use, §841(b)(1), and that such a scheme is constitutional. See, e.g., Baker, 2007 WL 148796, at *4 (explaining that the statute is constitutional because it imposes criminal liability only upon a finding of fault with regard to the conduct of distributing drugs; the

12

Constitution does not require that a defendant intend the consequences of his knowing or intentional act in order to be subject to harsher penalties under the statute).

The punishment-enhancing element of a resulting death will have to be found by the fact-finder beyond a reasonable doubt, as required by Booker, but neither that case, nor the statute, nor the Constitution requires the fact-finder to find that Defendant had a certain *mens rea* with regard to the resulting death. See id. (specifically addressing and rejecting the defendant's Apprendi argument in this context).

Courts have also rejected Defendant's proximate cause/foreseeability argument. Several courts use the terms "proximate cause" and "foreseeability" in discussing the *mens rea* question. For example, in McIntosh, in discussing the defendant's *mens rea* argument, the Eighth Circuit stated that the plain language of §841(b)(1)(C), "is unambiguous and that giving effect to its plain meaning prohibits us from superimposing upon the statute a foreseeability or proximate cause requirement." 236 F.3d at 972; accord Soler, 275 F.3d at 152-53. Indeed, even the Hatfield case, relied upon by Defendant, reaches this conclusion. See United States v. Hatfield, 591 F.3d 945, 948 (7th Cir. 2010) (noting "[t]he death or injury need not have been foreseeable").

Here, the government will have to present sufficient evidence to convince the fact-finder that the victim's death "result[ed] from" the use of the drug distributed by Defendant. See Hatfield, 591 F.3d at 947-48 (discussing the standard of proof to show causation in this context); United States v. Monnier, 412 F.3d 859, 861-62 (8th Cir. 2005) (holding that the evidence supported the finding that the victim's death 'result[ed] from'

13

the controlled substance provided by the defendant).  But this requirement does not render the statutory provision in question, as written or as applied in this case, unconstitutional.  "Cause-in-fact is required by the 'results' language, but proximate cause, at least insofar as it requires that the death have been foreseeable, is not a required element."  United States v. Houston, 406 F.3d 1121, 1125 (9th Cir. 2005); Baker, 2007 WL 148796, at *5.

Nor is the Court persuaded by Defendant's argument that the statute, construed in this manner, is unconstitutionally vague as applied.  "The vagueness doctrine recognizes that [a] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.  In other words, void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed."  United States v. Birbragher, ___ F.3d ___, 2010 WL 1643600, at *4 (8th Cir. Apr. 26, 2010) (quoted case omitted).

Here, Defendant was put on notice of the prohibited conduct by the plain language of the statute.  The statute plainly makes it unlawful for any person "knowingly or intentionally" to "distribute  . . . a controlled substance."  21 U.S.C. § 841(a)(1).  Defendant does not contend that he or any other member of the public could not understand this proscription.  See Birbragher, 2010 WL 1643600 at *8 (holding that Controlled Substances Act was not unconstitutionally vague in violation of the Due

Process Clause as applied to the defendant). The language of 21 U.S.C. § 841(b)(1)(C),

providing an increased penalty in the "if death or serious bodily injury results from the

use of such substance" is also sufficiently clear to provide reasonable notice of the

circumstances that will lead to an enhanced penalty. See United States v. Chevalier, 776

F. Supp 853, 859 (D. Vt. 1991) (holding, in rejecting a void- for-vagueness challenge,

"[a]n individual of ordinary intelligence and understanding would have no difficulty,

comprehending the meaning of the statute, and thus is fairly advised of the penalties for

his crime."). See also Hatfield, 591 F.3d at 949 (noting the statutory language was "a

good deal clearer than the [added language in the jury instruction] and probably clear

enough."); McIntosh, 236 F.3d at 972 (holding identical language of § 841(b)(1)(A) to be

unambiguous and intending "to expose a defendant to a more severe minimum sentence

*whenever* death or serious injury is a consequence of the victim's use of a controlled

substance that has been manufactured or distributed by that defendant"); United States v.

Patterson, 38 F.3d 139, 145 (4th Cir. 1994) ("The statute puts drug dealers and users on

clear notice that their sentences will be enhanced if people die from using the drugs they

distribute.").

Although Defendant suggests that one might be held liable even if death was due

to a host of intervening circumstances, Defendant purports to assert an "as applied"

challenge, and no such intervening circumstances are present here. See Baker, 2007 WL

148796, at *6. As the government correctly notes, even if construed as a facial challenge,

Defendant would be required to show, "at a minimum, that the challenged law would be

vague in the mast majority of its applications; that is, that the vagueness permeates the text of the law." Doctor John's, Inc. v. City of Roy, 465 F.3d 1150, 1152 (10th Cir. 2006). Defendant does not and cannot make such a showing. As such, Defendant's motion to dismiss the indictment should be denied.

Defendant's alternative requests for an order precluding the United States from arguing that 21 U.S.C. § 841(b)(1)(C) uses a strict liability analysis, and for jury instructions incorporating a *mens rea* requirement to the "if death . . . results" element, are trial matters for the District Judge's consideration.

### B. **Motion for Bill of Particulars** [Doc. # 63]

Defendant has filed a motion, pursuant to Fed R. Crim. P. 7(f), for a bill of particulars with regard to Counts II and III. Specifically, Defendant seeks the names of any and all alleged co-conspirators and known aliases used by those co-conspirators; the times, places and dates on which the conspiracy allegedly began; the times, places and dates on which the Defendant and each alleged co-conspirator joined and where applicable, withdrew from, the conspiracy; a description of any and all overt acts in furtherance of the alleged conspiracy and the times, places and dates of such overt acts; the names of all participants in any overt acts, and a statement of each participant's activities, including which alleged co-conspirators performed which alleged overt acts and the roles played by each participant in such acts; the means used to accomplish the objectives of the conspiracy; a description of Defendant's alleged roles and overt acts in furtherance of the conspiracy, including whether he is charged as an aider and abettor or

as a supervisor, manager, or organizer; and any other information or relief the Court deems necessary and proper to allow Defendant to prepare for his defense.

The United States opposes Defendant's motion, asserting that it has provided reports and discovery sufficient for him to prepare for trial, minimize the danger of surprise at trial, and enable him to plead acquittal or conviction in bar of another prosecution for the same offense. In reply, Defendant denies that the discovery provided is sufficient to allow the preparation of a defense on these two counts, however, the level of detail Defendant discusses in connection with the motion to sever somewhat belies this contention.

The determination of whether to grant a bill of particulars is committed to the sound discretion of the court. United States v. Livingstone, 576 F.3d 881, 883 (8th Cir.), cert. denied, 130 S.Ct. 1032 (2009); United States v. Sileven, 985 F.2d 962, 966 (8th Cir. 1993). The primary purpose of a bill of particulars is to apprise the defendant of the nature of the charges against him "'with sufficient precision to enable him to prepare for trial' and 'to avoid or minimize the danger of surprise at trial.'" Livingstone, 576 F.3d at 883 (quoting United States v. Hernandez, 299 F.3d 984, 989-90 (8th Cir. 2002). The purpose of a bill of particulars is not discovery or to provide detailed disclosure of the government's evidence at trial. United States v. Wessels, 12 F.3d 746, 750 (8th Cir. 1993); United States v. Matlock, 675 F.2d 981, 986 (8th Cir. 1982); United States v. Hill, 589 F.2d 1344, 1352 (8th Cir. 1979). Moreover, as the government correctly notes, nothing entitles a defendant to a list of all overt acts related to the conspiracy, the exact

date when the conspiracy began, or the names of all coconspirators.  United States v. DiCesare, 765 F.2d 890, 897-98 (9th Cir.), amended on other grounds, 777 F.2d 543 (9th Cir. 1985); accord, United States v. Sellers, 603 F.2d 53, 56 (8th Cir. 1979) (defendants not entitled to disclosure of every act in furtherance of the conspiracy), vacated on other grounds, 447 U.S. 932 (1980) (sentencing), aff'd in all other respects, 628 F.2d 1085 (8th Cir. 1980); United States v. Long, 449 F.2d 288, 294-95 (8th Cir. 1971) (effort by defendants to establish exact times of act, through bill of particulars, in order to establish alibis, properly denied).  Nor is a defendant entitled to a list of the government's anticipated witnesses at trial in a non-capital case.  United States v. White, 750 F.2d 726, 728 (8th Cir. 1984); Sellers, 603 F.2d at 57.  "A defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case."  United States v. Giese, 597 F.2d 1170, 1181 (9th Cir. 1979).

Under this standard, it is clear that Defendant's written motion goes well beyond what Rule 7(f) contemplates and essentially seeks the bulk of the government's evidence in support of its case.  From a review of Count II of the indictment and the parties' filings, however, it is not clear that Defendant has sufficient information to prepare for trial and, in particular, to preserve his ability "to plead a conviction or an acquittal as a bar to a subsequent prosecution."  Wessels, 12 F.3d at 750.  Indeed, the Court cannot determine what information has been disclosed in discovery.  In response to Defendant's motion, the United States merely states that it "has provided reports prepared by an agent from the Drug Enforcement Administration, a video taped interview with a witness, and

18

certified pharmacy transaction logs relative to the defendant and others," and then declares, in conclusory fashion, that such discovery "serves to inform the defendant of the specifics of the charge, enabling him to adequately prepare for trial." Doc. #71, p. 2.

While the United States is not required to plead overt acts in connection with a narcotics conspiracy, the Court believes that Defendant is entitled to basic information regarding the nature of the conspiracy and those involved, information the Court cannot determine the government has provided in discovery. As such, and in light of the uncertain time frame alleged, the undersigned believes that Defendant's motion for a bill of particulars should be granted to require identification of the alleged co-conspirators as follows:

1. With respect to any individuals disclosed in the discovery, the government shall identify whether such individuals are alleged to be co-conspirators and state in general the nature of his or her involvement in the conspiracy. To the extent the government has identified any such individual by first name, nickname, or other identifying information, the government shall not be required to further identify such individuals;

2. With respect to any alleged co-conspirators not previously disclosed in the discovery, the government shall identify said individual, in some fashion, be that first name, nickname, or code name, and shall state in general the nature of his or her alleged involvement in the conspiracy.

These disclosures pursuant to Rule 7(f) will permit Defendant adequately to defend against the charges, avoid surprise at trial, and enable Defendant to plead his

acquittal or conviction in bar of another prosecution for the same offense. The remainder of the information requested by Defendant is in the nature of discovery and goes beyond the scope of Rule 7(f), and will therefore be denied.

C. **Motion for Production and Inspection of Grand Jury Transcripts** [Doc. #61]

Defendant seeks the production of grand jury transcripts. In support of his motion, Defendant incorporates the Emergency Motion Defendant filed immediately prior to the filing of the superseding indictment [Doc. #47], which motion was not addressed prior to the issuance of the superseding indictment. Defendant grounds his motion on his belief that Trawick and Darrin Firestine, who apparently testified before the initial grand jury, intended to exercise their Fifth Amendment rights not to testify before the second grand jury, which returned the superseding indictment. Defendant contends that it would be improper either to call the witnesses and have them invoke their right to remain silent, or to read to the grand jury the transcripts of the witnesses' prior testimony, in light of their decision to invoke their Fifth Amendment rights. He asserts that "[r]eview of the grand jury transcripts will form a basis for dismissal of the Indictment."

"Where the defendant has alleged prosecutorial misconduct, dismissal of an indictment is proper only when the defendant demonstrates flagrant misconduct and substantial prejudice." United States v. Wadlington, 233 F.3d 1067, 1073-74 (8th Cir. 2000). "[D]ismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave

doubt' that the decision to indict was free from the substantial influence of such violations." Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988) (quoting United States v. Mechanik, 475 U.S. 66, 78 (1986) (O'Connor, J., concurring)).

The law further provides that the disclosure of matters occurring before the grand jury is permitted only upon a showing of particularized need for such disclosure. Pittsburgh Plate Glass Co. v. U.S., 360 U.S. 395, 398-399 (1959); United States v. McDougal, 559 F.3d 837, 840 (8th Cir. 2009). Defendant's belief that the witnesses in fact invoked their Fifth Amendment rights before the second grand jury – which belief may or may not be accurate – does nothing to undercut either the need for secrecy or the government's obligations with regard thereto. See McDougal, 559 F.3d at 839-40 (refusing to permit disclosure to the defendant of grand jury proceedings in which she was charged with criminal contempt, where the defendant asserted that the reasons for sealing the record had grown stale and disappeared).

Rule 6(e)(3)(E)(ii) of the Federal Rules of Criminal Procedure does provide an exception to the secrecy requirement, permitting a court to authorize the disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The Eighth Circuit has recognized, however, that "[a] request for disclosure that falls under one of these specified exceptions must also contain a 'showing of particularized need for grand jury materials' before disclosure becomes appropriate." McDougal, 559 F.3d at 840 (quoting United States v. Sells Eng'g, Inc., 463 U.S. 418, 443

(1983)); <u>accord</u> <u>United States v. Faltico</u>, 687 F.2d 273, 276 (8th Cir. 1982); <u>Thomas v. United States</u>, 597 F.2d 656, 657 (8th Cir. 1979) (citing cases).

Defendant has not shown a particularized need for the grand jury records requested here. Assuming that the two witnesses did invoke their Fifth Amendment rights before the second grand jury, the law does not prohibit a prosecutor from calling a witness to the grand jury who intends to invoke his Fifth Amendment rights. <u>Cf.</u> <u>United States v. Washington</u>, 431 U.S. 181, 191 (1977) ("[O]ur cases suggest that an indictment obtained through the use of evidence previously obtained in violation of the privilege against self-incrimination 'is nevertheless valid.'").[4] Such conduct, therefore, would not provide a basis for dismissal of the indictment.

Defendant's citation to §9-11.154 of the United States Attorney's Manual ("USAM") is of no avail. That section of the USAM refers to a "target" of the investigation, and here there is no reason to believe that these individuals were "targets" as opposed to witnesses or subjects of the investigation.[5] It also requires both the target and his or her attorney to state in writing that the witness will refuse to testify on such

_____

[4] Of course, Defendant has no standing to assert the Fifth Amendment rights of these witnesses. <u>See</u> <u>United States v. Red Elk</u>, 955 F. Supp. 1170, 1178 (D.S.D. 1997) (holding that the defendant had no standing to assert any parent/child privilege that might exist because he was not the person subpoenaed to testify before the grand jury).

[5] As defined in the USAM, a "target" is "'a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime *and who, in the judgment of the prosecutor is a putative defendant*.'" <u>United States v. P&S Foods, Inc.</u>, No. S2-4:02CR529 CDP DDN, 2003 WL 25735595, at *10 (E.D.Mo. Sept. 25, 2003) (emphasis added).

grounds. Though defense counsel has apparently had extensive communications with the counsel appointed for the witnesses, Defendant offers no evidence such notice occurred here. Further, by its plain language, the section discourages, but does not prohibit calling such a target.

But even if Defendant could show that the conduct at issue would violate the USAM – a fact he does not show here – a violation of the USAM does not provide a basis for dismissal of an indictment. See San Pedro v. United States, 79 F.3d 1065, 1070 (11th Cir. 1996) (U.S. Attorney Manual provides guidance only and does not have the force of law); accord United States v. Hughson, 488 F. Supp. 2d 835, 845 (D. Minn. 2007) (holding failure to advise the defendant before or during grand jury proceeding that he was a target, subject or witness, pursuant to USAM directive, was insufficient to warrant dismissal of the indictment); United States v. Fish, No. 05-CR-228A, 2006 WL 3731292 at *12 (W.D.N.Y. Dec. 18, 2006) ("The AUSA's failure to comply with DOJ directives provides no basis for suppressing testimony where no constitutional violation occurred."); United States v. Smith, No. CRIM.A. 01-348, 2002 WL 1059008 at *8 (E.D. La. May 24, 2002) ("More fundamentally, any violation of this regulation would not impact upon the integrity of the grand jury process itself, and thus is not the type of violation of positive law that gives rise to judicial review of an indictment."). Nor has Defendant shown any violation of the ABA Standards for Criminal Justice, especially where, as here, the prosecution stated its intention to offer immunity to the witnesses.

Likewise, the Court fails to discern how reading the prior testimony of the

23

witnesses to the second grand jury would be improper or provide a basis for dismissal. See United States v. Arlt, 15 F. App'x 431, 437 (9th Cir. 2001) (finding no defect in proceedings related to superseding indictment from fact government provided grand jury transcripts of the previous grand jury proceedings and a summary of evidence presented at such proceedings); United States v. Flomenhoft, 714 F.2d 708, 711-12 (7th Cir. 1983) (indictment by second grand jury valid though jurors chose not to hear live testimony, but relied on transcripts from earlier grand jury proceeding and some additional exculpatory evidence); United States v. Wander, 601 F.2d 1251, 1260 (3d Cir. 1979) (recognizing that "the reading of transcript testimony of witnesses before a prior grand jury to the grand jury in a subsequent case does not amount to an abuse of the grand jury process."). On the contrary, such use is expressly permitted by the federal rules. See Fed. R. Crim. P. Rule 6(e)(3)(C) ("An attorney for the government may disclose any grand jury matter to another federal grand jury.").

Defendant cites to United States v. Samango, 607 F.2d 877, 883 (9th Cir. 1979) for the proposition that an indictment may be subject to dismissal where the prosecutor read to a subsequent grand jury deceptive testimony elicited from a witness in the prior grand jury. But Samango was decided before United States v. Williams, 504 U.S. 36, 46, 112 S.Ct. 1735, 1742 (1992), in which the Supreme Court limited the exercise of the Court's supervisory powers over grand jury proceedings. In Williams, the Court recognized that Bank of Nova Scotia held that a court's "supervisory power can be used to dismiss an indictment because of misconduct before the grand jury, at least where that

misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'" But the Court held that such supervisory powers could not be used as a means of "*prescribing* those standards of prosecutorial conduct in the first instance." Id. (emphasis in original). The Court explained, "[b]ecause the grand jury is an institution separate from the courts, over whose functioning the courts do not preside, we think it clear that, as a general matter at least, no such 'supervisory' judicial authority exists....." Id. The undersigned questions whether some of the "irregularities" cited in Samango would be deemed to fall within the limited category of violations contemplated by the Court in Williams.

Defendant's reliance on Samango is misplaced for other reasons, as well. First, although Defendant alleges that the use of transcript testimony would be improper here because the witnesses suffer from credibility problems, Defendant offers no evidence, description or even suggestion of the nature of any such credibility problems. That a witness may choose to make a new decision regarding whether to testify, due to a change in the charges, or the suggestion of the target/defendant, does not render the witness's prior testimony deceptive or improper. See Washington, 431 U.S. at 191.

Second, the Samango court did not dismiss the indictment due solely to the prosecution's use at the second grand jury of the transcript of testimony that had the effect of masking the witness's lack of credibility, as Defendant suggests. Rather, there were a host of other irregularities upon which the court relied. For example, the

prosecutor introduced testimony of the defendant from two years previous, which was wholly unnecessary to the new proceedings, in which the defendant asserted his Fifth Amendment rights, and the transcript included what the court described as "an impressive repertory of insults and insinuations." Samango, 607 F.2d at 883. In addition, the lengthy transcripts, totaling one thousand pages, were simply deposited with the grand jury. The prosecutor then advised the foreperson that they had a limited amount of time to reach a conclusion, and there was also evidence suggesting that the transcripts were not reviewed by at least some of the grand jury. And the court found that the one live witness, the agent, gave misleading testimony suggesting the grand jurors could not request live testimony. The court specifically held, "[*t]he cumulative effect* of the above errors and indiscretions, none of which alone might have been enough to tip the scales, operated to the defendants' prejudice by producing a biased grand jury." Id. at 884 (emphasis added). Thus, assuming Samango continues to have full vitality after the Supreme Court's decision in Williams, its facts are not at all similar to those presented here.[6]

---

[6] Indeed, the Court has difficulty with several of Defendant's case citations. For example, at p. 4 of the Emergency Motion (Doc. #47), Defendant cites United States v. Kouba, 822 F.2d 768, 773-74 (8th Cir. 1987) for the proposition that "Summaries of earlier testimony of witnesses are also problematic, particularly if they are misleading and incomplete summaries." But the Court in Kouba offered no such holding. Rather, after affirming the district court's finding of no actual prejudice, the Eighth Circuit found it unnecessary to reach the various irregularities cited by the defendant because any errors were harmless. Id. at 774 ("Even assuming, however, that there were errors in the charging decision that may have followed from the conduct of the prosecution or Mongeon, the petit jury's guilty verdict rendered those errors harmless."). Id. Nor does

As such, Defendant has failed to show the type of "particularized need" required to outweigh the public policy of grand jury secrecy, especially where, as here, the "misconduct" alleged by Defendant would not support a motion to dismiss in any event. See United States v. Neha, 376 F. Supp. 2d 1222, 1227 (D.N.Mex. 2005) (disallowing request for production of grand jury transcripts where the defendant had a theory that made the transcripts relevant, but no evidence, and there were other explanations for conduct also possible). As the Eighth Circuit recognized in Thomas, "[s]uch 'fishing expeditions' do not provide sufficient grounds for disclosure." Thomas, 597 F.2d at 658; Neha, 376 F. Supp. 2d at 1227 (rejecting disclosure where defendant's request for transcripts "is a fishing expedition for evidence to support his theory, not to prove it").

**D. Motion for Severance** [Doc. #65]

Defendant has filed a motion, pursuant to Rules 8(a) and 14(a) of the Federal Rules of Criminal Procedure, requesting that Count I be severed from Counts II and III, for separate trial. Defendant asserts that Count I is not properly joined with Counts II and III, asserting that they involve "different drugs" (methadone versus oxycodone), different times, "different theories," and "different people," further contending that "[t]he only similarity is that both counts involve Mr. Stacy." Doc. #64, at 3.

"When a defendant moves for a severance, the [Court] must first determine

---

the Court perceive any similarity whatsoever between the argument Defendant makes here and the facts presented in United States v. Aisenberg, 247 F. Supp. 2d 1272, 1277 n.3 (M.D. Fla. 2003), *reversed in part on other grounds*, 358 F.3d 1327 (11th Cir. 2004), a rather extraordinary Hyde Amendment case.

whether joinder is proper under Federal Rule of Criminal Procedure 8. If joinder is proper, the Court still has discretion to order a severance under Federal Rule of Criminal Procedure 14." United States v. Darden, 70 F.3d 1507, 1526 (8th Cir. 1995). These rules are to be liberally construed in favor of joinder. Id.; United States v. Rock, 282 F.3d 548, 552 (8th Cir. 2002).

Rule 8(a) provides that an indictment may charge a defendant in separate counts with two or more offenses if the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." See United States v. Moeckly, 769 F.2d 453, 464-65 (8th Cir. 1985). The determination of whether joinder is proper is made from the face of the indictment, United States v. Bledsoe, 674 F.2d 647, 655 (8th Cir. 1982), and is reviewed de novo on appeal, United States v. Tyndall, 263 F.3d 848, 849 (8th Cir. 2001). Among the factors the courts examine is the extent to which the evidence related to the different counts overlaps. Id.

The United States asserts that joinder is proper here because the offense charged in Count I is similar to and factually connected with the other two offenses, as the "offenses are part of the defendant's consistent course of conduct in serving as a significant supplier of illegally distributed prescription drugs to drug abusers in Dent County, during roughly the same time frame." Doc. #73, at 2. The government further asserts that others who received methadone from Defendant, including the victim, also received oxycodone from him, and that the charges involve overlapping testimony.

The Court agrees that joinder is proper here. At issue is a similar time period, and allegations of the distribution of prescription drugs by Defendant in the same area, namely Dent County. Though Count I involves methadone, and the remaining counts involve oxycodone, both are prescription drugs, and are sufficiently similar for purposes of joinder. See United States v. Ruiz, 412 F.3d 871, 886 (8th Cir. 2005) (upholding the joinder of charges of conspiracy to distribute methamphetamine and aiding and abetting possession with intent to distribute methamphetamine, with charges of possession with intent to distribute cocaine and making a residence available for the purpose of storing, distributing, and using a controlled substance, recognizing "[a]ll the crimes charged are offenses of the same or similar character"); see also, United States v. Smith, 348 F. App'x 636, 638 (2d Cir. 2009), cert denied, 130 S.Ct. 1310 (2010). Nor do the counts involve inconsistent theories, as Defendant suggests. The Court finds neither a factual or a logical basis for Defendant's contention that one alleged to be a prescription drug dealer, as in Counts II and III, "would never provide drugs to anyone with out (sic) something in return," as may have occurred in Count I. Thus, this case is distinguishable from United States v. Tubol, 191 F.3d 88, 92 (2d Cir. 1999), cited by Defendant, which involved distinct robberies committed in a wholly separate manner. Moreover "complete, mutual admissibility . . . is not a requirement for valid joinder of offenses." United States v. Jamar, 561 F.2d 1103, 1108 n.8 (4th Cir. 1977) (citing Baker v. United States, 401 F.2d 958, 974-75 (D.C. Cir. 1968)).

Further, the prosecution has asserted that individuals who received methadone

from Defendant on February 22-23, including the victim, also received oxycodone from Defendant during the course of the conspiracy charged in Count II, and one witness who purchased oxycodone from Defendant purchased and used methadone from others during the same time frame in the presence of Defendant. Thus, it appears that proof of the charges may indeed involve overlapping evidence. In light of the mandate that Rule 8(a) be liberally construed in favor of joinder, this Court finds that joinder is proper.

Even if joinder is proper, Rule 14 provides that the court may order separate trials of counts or provide other relief if the joinder of offenses appears to prejudice the defendant or the government. Fed. R. Crim. P. Rule 14(a). The determination of whether to grant or deny severance is committed to the sound discretion of the trial court, and requires a balancing of the interest in judicial economy against the risk of prejudice. Zafiro v. U.S., 506 U.S. 534, 541 (1993); United States v. Felici, 54 F.3d 504, 506 (8th Cir. 1995). Courts have recognized that severance may be appropriate under Rule 14 where damaging evidence related to one count would not be admissible in a separate trial of the other count. United States v. Aldrich, 169 F.3d 526, 528 (8th Cir. 1999). As the government notes, however, the Eighth Circuit has recognized that "there is a strong presumption against severing properly joined counts." United States v. McCarther, 596 F.3d 438, 442 (8th Cir. 2010); accord Ruiz, 412 F.3d at 886.

A joint trial of the charges here will promote judicial economy, as it appears that evidence relevant to the Count II conspiracy will, at a minimum, involve relevant background facts leading up to the events in Count I. See United States v. Orozco-

30

Rodriguez, 220 F.3d 940, 942 (8th Cir. 2000) ("Rule 404(b) does not bar evidence that completes the story of the crime or explains the relationship of the parties or the circumstances surrounding a particular event.").  And contrary to Defendant's assertions, strong arguments can be made that evidence of Defendant's distribution of prescription drugs from Counts II and III would be admissible under Rule 404(b) of the Federal Rules of Evidence in a separate trial of Count I to show intent, opportunity and absence of mistake, especially where, as here, Defendant has asserted to the police that while the methadone was his, he did not "distribute" or give it to Brian Firestine.  Likewise, Defendant's distribution of methadone on February 28 may be admissible in a separate trial of Counts II and III under Rule 404(b) for the same purposes.[7]  See United States v. Thomas, 593 F.3d 752, 757-59 (8th Cir. 2010) (upholding the admission in a trial for drug trafficking offenses in 2004 of evidence of drug trafficking in 2008); United States v. Johnson, 934 F.2d 936, 940 (8th Cir. 1991) (upholding the admission of similar drug activity in drug prosecution case).

It is true and of some concern that in a separate trial of Counts II and III, evidence of Brian Firestine's death would have little if any relevance.  But any prejudice can be addressed with a proper limiting instruction, or other safeguards, and given the slightly

---

[7]  Defendant's suggestion that subsequent events are never admissible under Rule 404(b) is an incorrect statement of the law.  See United States v. Rutkoske, 506 F.3d 170, 177 (2d Cir. 2007) (collecting cases), cert. denied, 128 S.Ct. 2488 (2008); United States v. Bibo-Rodriguez, 922 F.2d 1398, 1400 (9th Cir. 1991) (noting that "[b]y its very terms, 404(b) does not distinguish between 'prior' and 'subsequent' acts," and recognizing that subsequent act evidence may be allowed to prove intent.)

distinct time frames and the different drugs involved, there is little risk that the jury would be unable to separate and compartmentalize the evidence.   As such, the Court finds that severance is not warranted here.

### E.  **Motion to Suppress Statements Made on June 29, 2009**

Although Defendant made several statements to Sgt. Pabin, he seeks to suppress only the statements made at the Sheriff's Office on June 29, 2009.  Defendant contends that his statements on that day were not voluntary, asserting that they were the result of Sgt. Pabin's deceptive promises of leniency, coupled with Dep. Piatt's improper attempts to play on their past relationship.  As additional factors, Defendant asserts that he was physically vulnerable due to his medical condition, and that the officers' actions in showing him the autopsy photo further contributed to a coercive atmosphere which overbore Defendant's will.

A defendant may knowingly and intelligently waive his rights and agree to answer questions.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant. Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).  The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being

abandoned and the consequences of the decision to abandon it.  Moran v. Burbine, 475

U.S. 412, 423-24 (1986).  "A waiver is knowing if it is 'made with a full awareness of

both the nature of the right being abandoned and the consequences of the decision to

abandon it.' (citation omitted).  It is voluntary if it is 'the product of a free and deliberate

choice rather than intimidation, coercion, or deception.'"  United States v. Syslo, 303

F.3d 860, 865 (8th Cir. 2002) (quoting Moran, 475 U.S. at 421); accord United States v.

Turner, 157 F.3d 552, 555 (8th Cir. 1998).

Further, the statement itself must be voluntary and not the product of any police

conduct by which the defendant's will is overborne.  Connelly, 479 U.S. at 170; Haynes

v. Washington, 373 U.S. 503, 513 (1963).  "The requirement that Miranda warnings be

given does not, of course, dispense with the voluntariness inquiry."  Dickerson v. United

States, 530 U.S. 428, 444 (2000).  As the Supreme Court has recognized, however,

"[c]ases in which a defendant can make a colorable argument that a self-incriminating

statement was 'compelled' despite the fact that law enforcement authorities adhered to

the dictates of Miranda, are rare."  Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984);

see also Dickerson, 530 U.S. at 444.

As a threshold matter, the Court notes that Miranda warnings are required only if a

defendant is both "in custody" and subjected to interrogation.  See Stansbury v.

California, 511 U.S. 318, 322 (1994); Miranda, 384 U.S. at 478-79.  A defendant is

considered in custody for purposes of Miranda "when placed under formal arrest, or

when his or her freedom is restricted to a degree akin to formal arrest."  United States v.

33

Elzahabi, 557 F.3d 879, 883 (8th Cir.), cert. denied 129 S.Ct. 2781 (2009).  The

determination turns on whether, under the totality of the circumstances, a reasonable

person in the suspect's position "would have felt free to end the interrogation and leave."

Id. (citing United States v. Brave Heart, 397 F.3d 1035, 1038-39 (8th Cir. 2005)).

"Warnings are not required 'simply because the questioning takes place in the station

house, or because the questioned person is one whom the police suspect.'"  Jenner v.

Smith, 982 F.2d 329, 335 (8th Cir. 1993) (quoting Oregon v. Mathiason, 429 U.S. 492,

495 (1977)).

     In United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990), the Eighth Circuit

identified six "common indicia of custody" to be considered when determining whether a

suspect is in custody while being questioned:

> (1) whether the suspect was informed at the time of questioning that the
> questioning was voluntary, that the suspect was free to leave or request the
> officers to do so, or that the suspect was not considered under arrest; (2)
> whether the suspect possessed unrestrained freedom of movement during
> questioning; (3) whether the suspect initiated contact with authorities or
> voluntarily acquiesced to official requests to respond to questions; (4)
> whether strong arm tactics or deceptive stratagems were employed during
> questioning; (5) whether the atmosphere of the questioning was police
> dominated; or (6) whether the suspect was placed under arrest at the
> termination of the questioning.

Id. at 1349.  The first three factors tend to mitigate against a finding of custody, and the

last three tend to weigh in favor of a finding of custody.  United States v. Axsom, 289

F.3d 496, 500-01 (8th Cir. 2002).  The Eighth Circuit has recognized, though, that

"[t]hese factors are not exclusive."  Further, "custody 'cannot be resolved merely by

counting up the number of factors on each side of the balance and rendering a decision accordingly.'" Elzahabi, 557 F.3d at 883 (quoting United States v. Czichray, 378 F.3d 822, 827-28 (8th Cir. 2004)). A particularly strong showing on one factor may compensate for a weak showing on other factors. See Axsom, 289 F.3d at 501; Griffin, 922 F.2d at 1349. The determination is an objective one, which does not turn on "the subjective views harbored by either the interrogating officers or the person being questioned." Thatsaphone v. Weber, 137 F.3d 1041, 1045 (8th Cir. 1998) (emphasis in original) (quoting Stansbury, 511 U.S. at 323).

On these facts, the Court finds that Defendant was not in custody at the time of his interview. Sgt. Pabin finally was able to speak to Defendant only after attempting to reach him for almost two months. During that time, he made no effort to arrest or detain Defendant. When he came to Defendant's house on June 29, Sgt. Pabin was alone. He simply told Defendant that he needed to speak to him, and in response to Defendant's question, responded that the conversation would need to take place at the station. Defendant was not restrained in any fashion and there was no display of force. The interview took place during the daytime, lasted only about 30 minutes, and Defendant was not arrested at the end of the interview. There is nothing to indicate that it was "police dominated." United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985).

As such, the interrogation was not "custodial," and the officers were not required to advise Defendant of his rights under Miranda. See California v. Beheler, 463 U.S. 1121, 1125 (1983) (recognizing that suspect is not in custody simply because questioning

took place at police station, and holding that <u>Miranda</u> warnings were not required when Defendant voluntarily accompanied police to station, talked to police for 30 minutes, and was permitted to leave); <u>United States v. Galceran</u>, 301 F.3d 927, 930-31 (8th Cir. 2002) (<u>Miranda</u> warning not required because defendant voluntarily went to police station upon request, was told he would not be arrested that day, was not interviewed in holding cell area, and was not arrested at conclusion of ninety-eight minute interview).

In any event, the officers nonetheless advised Defendant of his <u>Miranda</u> rights orally and in writing, and he thereafter agreed to waive his rights in writing. The Court finds Defendant's waiver was both knowing and voluntary, and that his oral and written statements to the officers were voluntary. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." <u>United States v. LeBrun</u>, 363 F.3d 715, 724 (8th Cir. 2004) (en banc). In determining voluntariness, the court examines the totality of the circumstances. <u>Id.</u> Relevant factors include the length of the detention, the repetitive and prolonged nature of questioning, the accused's age, and the questioning tactics. <u>Simmons v. Bowersox</u>, 235 F.3d 1124, 1133 (8th Cir. 2001).

Based on a review of the relevant circumstances, the Court finds that the government has met its burden to establish that Defendant's statements were voluntary. At the time of these events, Defendant was a 41 year old adult, who had had prior experience with law enforcement. The interview lasted only about 30 minutes, involved

no use of threats or force, and prior to any questioning Defendant was advised of his rights under <u>Miranda</u>. Indeed, in the written Advice of Rights signed by him, Defendant specifically acknowledged his understanding that he could "decide at any time to exercise these rights and not answer any questions or make any statements." And in the Waiver portion of the form, he further acknowledged: "No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." Govt. Ex. 2.

Defendant asserts that his statements on June 29 must nonetheless be suppressed due to Sgt. Pabin's "deceptive promises of leniency to Mr. Stacy and his mother," which Defendant contends constitute coercive police activity.[8] Specifically, Defendant contends that Sgt. Pabin's earlier statement to Defendant's mother and similar statement to Defendant that he "would not spend any time in our [the Dent County] jail" was misleading and rendered Defendant's statements involuntary.

As the United States notes, Sgt. Pabin's "promise" was not, in fact, untrue. Defendant was never arrested by the Dent County Sheriff, nor charged by the state. As Defendant correctly notes, however, a deceptive promise of leniency may be "improper" even when couched in technically truthful terms. <u>See</u> <u>Smith v. Bowersox</u>, 311 F.3d 915, 922 (8th Cir. 2002). In <u>Smith</u>, the primary case on which Defendant relies, a detective, in

---

[8] Although there is no evidence in this record that Defendant's mother ever relayed this comment to him, the Court will assume, for purposes of the motion, that Defendant's mother did advise Defendant of this comment and of the fact that Sgt. Pabin needed to speak with him. Apparently this information did not cause Defendant to contact Sgt. Pabin on his own.

connection with an investigation of a double homicide, told the defendant he would not "get the chair" because "they don't do that in this state." Id. at 922. While technically correct, because Missouri executed capital offenders with lethal injection – not the electric chair – the Eighth Circuit found the statement to be improper because the clear implication was that the defendant would not receive the death penalty.

Here, though, there was never any suggestion that the officers promised him he would never be prosecuted, nor were the officers authorized to promise, or imply they were authorized to promise, that he would not be prosecuted by federal authorities. See United States v. Estey, 595 F.3d 836, 839 (8th Cir. 2010) (holding that statement that defendant was not under arrest and would not be under arrest at the end of the interview was not a promise of total immunity). Defendant's suggestion that he would have no idea that his actions might violate a federal law is unpersuasive. Sgt. Pabin's statement was also coupled with the requirement that Defendant tell the whole truth, which the prosecution apparently does not believe occurred.

Further, even if viewed as misleading, a deceptive promise by law enforcement does not necessarily render a statement involuntary; rather it is but one factor to be considered. See Brave Heart, 397 F.3d at 1041 ("'Even assuming that a reasonable person would view [the officer's] statements as a promise, a promise made by law enforcement does not render a confession involuntary per se.'") (quoting LeBrun, 363 F.3d at 725) (internal quotations omitted). "It is simply one factor to be considered in the totality of the circumstances." Id.

In Brave Heart, officers were investigating the death of the defendant's ten-month-old nephew that occurred while the child was in the defendant's care.  In connection with the death, they questioned the defendant at the police station.  The defendant was only 24 years old and had had only minor contact with law enforcement.  The district court suppressed the defendant's confession based on the officers' failure to advise the defendant of his Miranda rights.  The district court also held that even if the interrogation was not custodial, the defendant's statement was rendered involuntary primarily because prior to questioning the officer advised the defendant that he was not under arrest, and that he did not intend to arrest him – even though the officer in fact intended to arrest him at the end of the interview.  The Eighth Circuit reversed both rulings.  The Court recognized that police officers use a variety of tactics in conducting police interviews, including "claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices." Id. at 1041.  "None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation caused the defendant's will to be overborne." Id.  The Court noted that it was "difficult to discern how Brave Heart was motivated by any perceived promises," given his initial denials of responsibility, and the Court found, under the totality of the circumstances, that the questioning was not "so coercive that it overbore his will and critically impaired his capacity for self determination." Id.

Here, based on the evidence presented and an evaluation of the credibility of the

witnesses, the Court finds that neither Defendant's waiver of rights nor his statements on June 29, 2009, were motivated by any belief that he would not be prosecuted. To the contrary, throughout the bulk of the interview, if not its entirety, Defendant continued to deny or downplay his involvement. Further, as in Brave Heart, the Court finds that Sgt. Pabin's "promise," in light of the circumstances as a whole, did not serve to overbear Defendant's will or critically impair his capacity for self-determination. As such, the "promise" by Sgt. Pabin did not render Defendant's statements involuntary. See United States v. Boskic, 545 F.3d 69, 78-81 (1st Cir. 2008) (holding that assertion by one officer that the defendant was not under investigation, and the purposeful silence of the other agents in the face of such assurance, did not render the defendant's statements involuntary); United States v. Santiago, 410 F.3d 193, 203 (5th Cir. 2005), cert. denied, 547 U.S. 1022 (2006) (rejecting the defendant's argument that his confession was involuntary, where the defendant had significant prior experience with law enforcement, though Defendant was not advised of his Miranda rights and the deputies assured the defendant that he would not be arrested if he cooperated); United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998) (finding statement made during courthouse interview at which the officer assured the defendant, who was being interviewed about the conduct of a third-party, that he was not "implicated in any of this," was voluntary, "even if [the defendant] were deceived"); United States v. Johnson, No. 1:08CR110 RWS, 2009 WL 367612, at *9 (E.D.Mo. Feb. 11, 2009) (finding statements voluntary despite numerous assurances of leniency by officers).

Defendant contends that even if Sgt. Pabin's promise was not alone sufficient to require suppression, suppression is required when combined with three other factors, namely, that the officers unfairly played on Defendant's friendship with Dep. Piatt, their display to Defendant of a coroner's photograph of the victim, and the Defendant's poor physical health.

With regard to the first factor, Defendant cites United States v. Walton, 10 F.3d 1024 (3d Cir. 1993). This case is not at all like Walton, however. In Walton, the defendant, who believed he was facing only a regulatory investigation involving firearm sales, initiated contact with an officer who was a friend of his; they had gone to high school together and had been on the wrestling team together. The officers met the defendant in a park. The defendant was not advised of his Miranda rights, and the officer who was the defendant's friend told the defendant, "I've known you for a long time. If you want, you can tell us what happened off the cuff." Id. at 1027. At the hearing, the officer himself testified that it had been his own understanding that the agents would not use any statements the defendant made at that time against him, and that in fact was why he had not advised the defendant of his rights. Id. The Third Circuit found that the statements of the officer/friend had induced the defendant's confession, and that the actions were so manipulative as to deprive him of his ability to make an unconstrained, autonomous decision. Also important to the Court was the fact that the meeting occurred in a park, not a police station, and that defendant had previously been given his Miranda rights during the regulatory interview, but was not given his rights at the park.

Here, while Dep. Piatt knew Defendant, and they had attended the same high school, Dep. Piatt attended school with Defendant's younger brother, not with Defendant. There is nothing in this record to reflect that they were in fact friends. To the contrary, at the time of the interview Dep. Piatt did not know Defendant well enough to know that the victim here was Defendant's nephew.

Moreover, Defendant's suggestion that Dep. Piatt played on this relationship to set Defendant at ease overstates, and indeed, mischaracterizes the facts. Dep. Piatt mentioned that Defendant knew him in the context of reminding Defendant that Defendant, like everyone else, knew that Dep. Piatt had been working drugs and narcotics in the area for quite some time. He then advised Defendant that in light of his background in narcotics, he was unpersuaded by the manner in which Defendant constantly qualified his actions by stating that he did not "physically" give any drugs to anyone; rather, Dep. Piatt told him that he took this to allow for Defendant nonetheless making the drugs available. As such, rather than using the relationship to falsely set Defendant at ease, as the court found the detective had done in Walton, Dep. Piatt used Defendant's knowledge of the fact that he was an experienced narcotics officer to communicate to Defendant that he did not believe Defendant was stating the whole truth.

And here, unlike in Walton, the interview was conducted at the police station and Defendant was advised of his rights under Miranda. As the court noted in Walton, one of the very reasons for Miranda warnings is to alert the suspect that "he is faced with a phase of the adversary system." Id. at 1030 (quoting Miranda, 384 U.S. at 469).

Likewise, the Court rejects the argument that Defendant's physical health weighs in favor of a finding of involuntariness. While Sgt. Pabin thought Defendant looked "white," he did not perceive Defendant having any medical difficulties. Morever, Dep. Piatt, who was more familiar with Defendant's usual appearance, noticed nothing out of the ordinary about his appearance. Apart from the fact that Defendant was using oxygen -- a fact that has little if any bearing on his susceptibility to pressure or deception -- there is no evidence in the record to suggest that Defendant's health in any way made him more vulnerable. He at no time suggested that he was not feeling well, or was in need of medication. And at the hearing, Defendant offered no evidence regarding the nature of Defendant's medical condition or how that condition impacted his mental or physical health. See United States v. Cristobal, 293 F.3d 134, 142 (4th Cir. 2002) (holding that "[m]edical records indicating that a suspect had been given narcotics, with no supporting evidence as to the effects of those narcotics (on the individual or even in general) are not sufficient to render a waiver of Miranda rights unknowing or unintelligent"). As such, there is no evidence that Defendant's medical condition had any impact on the voluntariness of Defendant's waiver or statements. See United States v. Martin, 369 F.3d 1046, 1056 (8th Cir. 2004) (rejecting the defendant's assertion that the defendant had a "weakened capacity" to resist agents' actions, that were "perhaps not at all times straightforward," because of stomach ailment and medication); Cristobal, 293 F.3d at 140-141 & n.9, 143-44, (finding waiver and statement to be voluntary though the defendant was in the hospital and had been given pain killers and narcotics; rejecting

argument that coercion and overreacting occurred because agents did not wait until the defendant was released from hospital or transferred out of intensive care).

Nor does the display of the autopsy photograph warrant a different conclusion. Defendant offered no evidence as to the nature of the photograph. Moreover, this was not the first time Defendant would have seen the victim's body, as he was there when the victim was discovered and remained at the scene for some time thereafter. Finally, this interview took place more than four months after the event, and there is no suggestion that the photograph was overly emphasized by the officers. Rather, it was used simply as a reminder of the seriousness of the events that had transpired that night.

As such, based on the totality of all of the circumstances, the Court finds that Defendant's statements were voluntary and that no basis exists for the suppression of his statements.

### E. Motion to Compel Production of Rough Notes

Defendant seeks to require the government to produce any and all rough notes of the interviews taken of Defendant on February 23, 2009, and June 29, 2009, pursuant to Fed. R. Crim. P. 16(a)(1)(B)(ii). In response, counsel for the government has stated that he has contacted officers and agents who participated in the investigation and directed them to retain all rough notes.[9] Further, counsel states that the government has turned

---

[9] It is not clear whether notes of the interviews referenced by Defendant even exist. Sgt. Pabin testified at the hearing that he kept only minimal notes of basic information, such as names, places of birth, etc., and that he discarded the notes when he incorporated the information into his report shortly after the interview. And he took no

over the written statements made by Defendant and the report by law enforcement officers summarizing Defendant's statements, but that any rough notes are not "statements" subject to discovery under Rule 16.

With respect to the disclosure of agent rough notes, the Eighth Circuit has indicated that it is a preferable practice that rough notes be retained, irrespective of whether they might be discoverable by the defendant.  See United States v. Grunewald, 987 F.2d 531, 535 (8th Cir. 1993); United States v. Leisure, 844 F.2d 1347, 1361 n.10 (8th Cir. 1988).  The prosecutor agreed to direct such retention, and has already done so.  Defendant has made no showing, however, that such notes are required to be produced.  See United States v. Wright, 540 F.3d 833, 841-2 (8th Cir. 2008) (holding agent interview notes not "statements" required to be produced under Jencks Act); United States v. Greatwalker, 356 F.3d 908, 911-12 (8th Cir. 2004) (holding agents' handwritten notes not required to be produced under Jencks Act, and that production under Brady v. Maryland, 373 U.S. 83 (1963), was required only if notes contain additional exculpatory information).

As such, Defendant's motion with regard to rough notes will be granted insofar as the United States Attorney is ordered to direct the investigating agents to retain any presently existing rough notes made during their investigation of the matters alleged in the indictment – an action the AUSA has already taken.  The motion will be denied

_____

notes on the second interview.  Dep. Piatt also testified that he took no notes of the interview.  Hearing Tr. pp. 13, 37, 49 and 71.

insofar as Defendant requests that the notes be provided to him at this time.  If such notes exist and constitute material required to be produced pursuant to 18 U.S.C. § 3500 or Rule 26.2 of the Federal Rules of Criminal Procedure, Defendant may request their production at the time of trial.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion to produce and allow inspection of grand jury transcripts is **DENIED**. [Doc. #61]

**IT IS FURTHER ORDERED** that Defendant's motion to compel production of rough notes is **GRANTED in part** and **DENIED in part**. [Doc. #62]

**IT IS FURTHER ORDERED** that Defendant's motion for a bill of particulars is **GRANTED** to require limited disclosure of the alleged co-conspirators, but is otherwise **DENIED**. [Doc. #63]

**IT IS HEREBY RECOMMENDED** that Defendant's motion to suppress statements be **DENIED**. [Doc. #64]

**IT IS FURTHER RECOMMENDED** that Defendant's motion to sever counts of the superseding indictment be **DENIED**. [Doc. #65]

**IT IS FURTHER RECOMMENDED** that Defendant's motion to dismiss the superceding indictment on the ground that 21 U.S.C. § 841(b)(1)(C) is unconstitutional be **DENIED**. [Doc. #66]

Trial in this matter is hereby scheduled for July 6, 2010 at 9:00 before The Honorable Rodney W. Sippel.

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).


_____
AUDREY G. FLEISSIG
United States Magistrate Judge


Dated this 21st day of May, 2010.